IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 24, 2015 Session

**IN RE GRACE N.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT120820      Sophia Brown Crawford, Judge**

_____

**No. M2014-00803-COA-R3-JV – Filed May 14, 2015**

_____

In this juvenile court proceeding, Father objects to a number of decisions made by the trial court concerning the parenting plan for the parties' child. We have determined that the trial court erred in its determinations regarding parenting time and child support. As to the latter, the trial court failed to consider Father's argument that Mother was underemployed, abused its discretion in its treatment of Mother's work-related child care expenses, and failed to properly calculate Father's income. We find no merit in any of the other issues raised by Father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Jeffrey Spark, Nashville, Tennessee, for the appellant, Julian G.

D. Scott Parsley, Nashville, Tennessee, for the appellee, Rachel C. N.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Rachel N. ("Mother") and Julian G. ("Father") met online while Father was living and working in France. He returned to Nashville in January 2009 to live near Mother; they lived together for a short time, but Father moved out within a month. Although they reconciled, Father did not move back into Mother's home. On June 4, 2009, Mother informed Father that she was pregnant. The child, Grace N., was born in January 2010.

On January 13, 2010, Father filed a petition to establish parentage; Mother filed a counter-petition to set child support and parenting time. In August 2010, the juvenile court entered an order stating that DNA testing had established Father to be the biological father of Grace N. The court noted that the child had been born approximately one month premature, weighing four pounds, four ounces. At her age at the time of the hearing of four and one-half months old, she weighed ten pounds, three ounces. Because of her low birth weight, the child had increased susceptibility to infection. In addition, Mother was breast-feeding. The court awarded Father temporary parenting time each week on Monday and Friday from 7:00 a.m. to 8:30 a.m. and each Saturday from 11:00 a.m. to 12:30 a.m. in the nursery at Mother's house. Father was to pay $1,331 per month in child support.

In November 2010, the parties entered into an agreed order modifying the temporary parenting time and setting holiday parenting time. Under this agreed order, Father was permitted to exercise parenting time outside of Mother's home provided that he purchase a new child car seat. In October 2012, the court heard Father's motion to incorporate overnight parenting time into the temporary parenting schedule pending the final hearing. The court awarded Father parenting time every other weekend from Saturday at 10:00 a.m. until Sunday at 6:00 p.m. Father was required to keep a journal of Grace's fluid intake and urination and bowel movements.[1]

The magistrate held a final hearing on Father's petition to establish parentage and Mother's counter-petition over two days in January 2013. The court found that Father's request for equal parenting time was "not feasible" and "not in the child's best interests." The court adopted Mother's parenting plan with some changes. In an order entered on March 27, 2013, the court held that Father owed retroactive child support in the amount of $925.00 per month for 4.5 months for a total of $4,162.50; $2,709.70 for medical expenses; and $2,454.00 for prenatal expenses.

Father immediately requested a de novo hearing before the juvenile court judge. The matter was heard over seven days in July, August, September, and October 2013 and February 2014. The following witnesses testified: Jennifer McCullough, preschool teacher; Father; Angela Martin, mortgage banker; Eric Rajotte, co-owner of property with Father; Father's wife; Grace's maternal grandmother; and Mother. Due to the voluminous transcript, we will discuss the testimony as relevant to the issues below.

The trial court found that Father did not dispute the magistrate's designation of Mother as the primary residential parent, and the court found that Mother was "the evident and obvious choice" to be the primary residential parent. As to the parenting schedule, the trial court found that it was in the child's best interest to adopt Mother's

---

[1] Grace had been diagnosed with hydronephrosis, a kidney condition.

proposed parenting schedule, which gave Father 85[2] days of parenting time. The court also gave Mother sole decision making authority on the basis that the parties did not "communicate effectively." In calculating the amount of retroactive child support due, the court found that Father "lacks credibility as to his income and that he failed to provide reliable evidence of his 'total' income." The court presumed that Father's ownership interest in the Fatherland Street property[3] was fifty percent (50%). The court added $20,327.50 to Father's income in 2013 for the value of bartered services. The court explained its computation of additional income attributed to Father.

Father's current child support was set at $1,218.00 per month. Retroactive child support was set for each year, beginning in 2010; the amount paid by Father was then subtracted from the amount calculated to be owed. This resulted in a total amount of retroactive child support of $13,272.97. Father owed $1,647.47 in prenatal medical expenses, and $4,498.14 in postnatal medical expenses. Father received credit in the amount of $5,302.80 for garnishment payments, leaving a total judgment of $12,468.31.

ISSUES ON APPEAL

Father raises a number of issues in this appeal: (1) Whether the trial court erred in granting Father only 68 days of parenting time; (2) whether the trial court erred in setting current child support and child support arrears; (3) whether the trial court erred in enjoining/restraining Father from making audio or video recordings during the exchange of the child; (4) whether the trial court erred in ordering Mother to provide health insurance rather than allowing Father to provide health insurance for the child; (5) whether the trial court erred in ordering the parties to attend mediation in the event of disagreement about the parenting plan; (6) whether the trial court erred in allocating sole decision-making authority to Mother; and (7) whether Father is entitled to his attorney fees on appeal. Mother argues that the trial court erred in declining to award her her attorney fees below; she also asserts that she is entitled to her attorney fees on appeal.

ANALYSIS

(1) Parenting time

Father argues that the trial court erred in awarding him only 68 days of parenting time. He asserts that he should receive the 173 days of parenting time requested in his proposed parenting plan, or at least a greater number of days than awarded by the trial court.

---

[2] As will be discussed later in the opinion, Father and Mother differ in their calculation of the number of days provided for in the parenting plan adopted by the court. Mother asserts that the plan gives Father 85 days of parenting time; Father argues that the plan only gives him 68 days of parenting time a year.

[3] Father purchased a piece of rental property on Fatherland Street with Eric Rajotte and Richard Rajotte.

A trial court's decision regarding parenting time is reviewed under the deferential abuse of discretion standard:

> Trial courts have broad discretion to fashion parenting plans that best serve the interests of the children. Tenn. Code Ann. § 3-6-101(a)(2)(A) (Supp. 2004). They must, however, base their decisions on the evidence presented to them and upon the proper application of the relevant principles of law. *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). While we are reluctant to second-guess a trial court's decisions regarding a parenting plan, *see Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997), we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Steen v. Steen*, 61 S.W.3d at 328; *Placencia v. Placencia*, 3 S.W.3d 497, 499 (Tenn. Ct. App. 1999).

*Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004).

In this case, the trial court made the following decision regarding the parenting schedule:

> The purpose of parenting time is to enable each parent to maintain a loving, stable, and nurturing relationship with the child. Based on the evidence presented, the Court finds that it is in the child's best interest that Mother's Proposed Parenting Schedule (Exhibit 66) be adopted by the Court and made an Order of the Court considering the factors set forth at Tenn. Code Ann. § 36-6-106(a)(1)-(10),[4] which weigh heavily in favor of Mother.

---

[4] At the time of the trial court's decision, Tenn. Code Ann. § 36-6-106(a) listed the following factors:

> (1) The love, affection and emotional ties existing between the parents or caregivers and child;
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length to time the child has lived in a stable, satisfactory environment . . . ;
> (4) The stability of the family unit of the parents or caregivers;
> (5) The mental and physical health of the parents or caregivers;
> (6) The home, school and community record of the child;
> (7)(a) The reasonable preference of the child if twelve (12) years of age or older; . . .
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .
> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
> (10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to

While both Mother and Father appear to have stable, healthy relationships with the child, and share love, affection and emotional ties with the child, Mother has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child and shows a better disposition to provide the child with food, clothing, medical care, education and other necessary care. Mother has been the primary caregiver and taken the greater responsibility for performing parental responsibilities since the child's birth. By all accounts, the child has thrived under Mother's care. Mother has shown a willingness and ability to facilitate and encourage a close and loving relationship between Father and child by offering Father parenting time with the child prior to the establishment of parentage and the Court's initial award of parenting time to Father and additional time to that awarded to Father by the Magistrate. Mother's employment schedule has proven to be far more flexible to the needs of the child than Father's employment schedule, which requires Father to travel frequently, with little notice, for extended periods and occasionally out of the country. Mother has been stable with her employment. Father has had several employers as well as different types of self employment. His current employment appears stable. Further Father has moved several times during this prolonged litigation.

In light of all of these factors, the trial court reached the following conclusions:

The adoption of Mother's Proposed Parenting Schedule will provide continuity, consistency and stability for the child. The Court further finds that it would not be in the child's best interest to adopt Father's Proposed Parenting Schedule. The parties have shown that they are not able to effectively communicate. The Court finds that to place the child in the parenting arrangement, as proposed by Father, would more likely than not be harmful to the child and disturb her current stability. This has been demonstrated through the e-mail exchanges between the parties which were often taken out of context by Father and used by him as a platform to throw unnecessary and uncalled for barbs at Mother.

In arguing that the trial court erred in adopting Mother's parenting plan, Father relies on new language in Tenn. Code Ann. § 36-6-106(a), which provides: "In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents the *maximum participation possible* in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." (Emphasis added).

---

facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

The parenting schedule adopted by the trial court for Father is as follows: Friday at 6:00 p.m. to Sunday at 6:00 p.m. every other week; Thursday at 4:00 p.m. to Thursday at 6:30 p.m. every week. Where the following days do not fall during Father's parenting time: Father's Day, 9:00 a.m. to 6:00 p.m.; child's birthday, 4:00 p.m. to 7:00 p.m. on the day preceding the child's birthday; Father's birthday, 9:00 a.m. to 7:00 p.m., or 4:00 p.m. to 7:00 p.m. if a school day; Halloween, in odd years, 5:00 p.m. to 8:30 p.m. (10:00 a.m. the following morning if Halloween falls on a weekend); Thanksgiving, in odd years 8:00 a.m. to 2:00 p.m. on Thanksgiving Day and 10:00 a.m. to 7:00 p.m. the following day; in even years, 3:00 p.m. on Thanksgiving Day to 10:00 a.m. the following day; New Year's, in odd years, December 31 at 3:00 p.m. to January 1 at 6:00 p.m. Fall vacation: Day-to-day schedule shall apply. Winter vacation: in odd years, 8 a.m. to 1:00 p.m. on Christmas Eve and 10:00 a.m. to 4:00 p.m. on Christmas Day; in even years, 4:00 p.m. on Christmas Eve until 9:00 a.m. on Christmas Day. Otherwise, the remainder of the child's Christmas vacation from school through December 30, the day-to-day schedule shall apply. Spring vacation: The day-to-day schedule shall generally apply except as follows: Father shall have parenting time in odd years at 6:00 p.m. the Saturday before Easter until 12:00 p.m. on Easter Sunday; in even years, from 1:00 p.m. on Easter Sunday until 10:00 a.m. the following day. Once the child starts school, Father shall have parenting time during the second half of the child's spring break. During summer vacation, each parent gets two non-consecutive weeks when they actually take vacation.

Mother's parenting plan states that Father has 85 days of parenting time; Father asserts that this schedule only gives him 68 days of parenting time. All of Mother's arguments are premised upon the notion that the trial court's parenting plan provides for 85 days of parenting time for Father. The child support guidelines define "day" for purposes of determining parenting time for child support:

> For purposes of this chapter, a "day" of parenting time occurs when the child spends more than twelve (12) consecutive hours in a twenty-four (24) hour period under the care, control or direct supervision of one parent or caretaker. The twenty-four (24) hour period need not be the same as a twenty-four (24) hour calendar day. Accordingly, a "day" of parenting time may encompass either an overnight period or a daytime period, or a combination thereof.

Tenn. Comp. R. & Regs. 1240-02-04-.02(10). Using this definition and applying it to the parenting schedule adopted by the trial court, we, like Father, calculate approximately 68 days of parenting time. The one unknown variable is the length of the child's future spring break. If the spring break is two weeks long, Father's parenting time could increase to 71 or 72 days. The Child Support Guidelines ("the Guidelines") presume that children will typically reside with the alternate residential parent a minimum of eighty (80) days per year. Tenn. Comp. R. & Regs. 1240-02-04-.04(7)(a). The following cases reference "standard parenting time": *Sitz v. Sitz*, No. E2012-01726-COA-R3-CV, 2013

WL 5450416, at *5 (Tenn. Ct. App. Sept. 30, 2013) (80 days); *Thompson v. Thompson, III*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *7 (Tenn. Ct. App. Oct. 24, 2012) (84 days); *Coats v. Coats*, No. M2007-01219-COA-R3-CV, 2008 WL 4560238, at *12 (Tenn. Ct. App. Oct. 8, 2008) (80 days).

The parenting plan adopted by the trial court differs from a "standard" parenting plan in that it does not provide for overnight parenting time during the week; most of the holiday parenting time is for less than twenty-four hours; there is no provision for a fall break; and the Christmas vacation parenting time is limited to less than twenty-four hours on Christmas Eve and Christmas Day. With the restrictions on Father's parenting time, it cannot be said that he is able to enjoy the "maximum participation possible" in his child's life. While the trial court's decision may contain reasons for rejecting Father's proposed week-on/week-off schedule, there is no justification in the record for the minimal amount of parenting time awarded to Father in the parenting plan adopted by the trial court.

We reverse the trial court's decision on parenting time and remand the matter with instructions to increase Father's parenting time to *at least* the minimum 80 days presumed by the Guidelines.

### (2) Child support

Father next challenges the amount of current child support and child support arrears set by the trial court. In particular, Father argues that: (A) Mother was underemployed in 2013; (B) Mother should not have been credited for all of her claimed "work-related child care expenses"; and (C) the trial court improperly attributed income to Father.

A. Underemployment. The Guidelines provide that additional income may be imputed to a parent who is determined to be willfully and/or voluntarily underemployed. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I). The purpose of the underemployment determination is to "ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii). The burden was on Father to prove that Mother was willfully or voluntarily underemployed. *Massey v. Casals*, 315 S.W.3d 788, 796 (Tenn. Ct. App. 2009).

The trial court based current child support on a gross monthly income for Mother of $2,165.00, as reflected on her 2013 federal income tax return. Father argues that Mother worked only part time in 2013 and "spent much of her time acting as a contractor on her and her husband's new home." Father asserts that Mother had two housekeepers, applied for private school for the child but did not apply for financial aid, was a licensed attorney, and now took the position that "she's unable to market her practice because she

has no time and did her marketing in the past in the evenings prior to the Child's birth." Prior to the child's birth, Mother was making $90,000 a year or more; in 2013, she made $19,000. Father argues that he should not have to subsidize Mother's decision to act as a contractor on her new home and "should not have to suffer the consequences if Mother's law practice is no longer viable." Mother counters that she assumed all parenting responsibilities until the child was over two-and-a-half years old while trying to work from home. She attributed the loss of a substantial portion of her income to her inability to hire other employees and to her main client leaving to go to a competitor in a buy out.

Mother acknowledges in her brief that Father argued at trial, as he does on appeal, that Mother was voluntarily underemployed. Yet, in its decision, the trial court states: "There was no dispute as to the accuracy of Mother's income." Thus, it appears that the court failed to consider Father's argument with respect to underemployment.[5] On remand, when the trial court increases Father's parenting time, child support will have to be recalculated and, at that time, the court will have another opportunity to expressly consider the issue of underemployment.

B. Work-related child-care expenses. The Child Support Guidelines define "work-related childcare costs" as "expenses for the care of the child for whom support is being determined which are due to employment of either parent or non-parent caretaker." Tenn. Comp. R. & Regs. 1240-02-04-.02(29)(a). These childcare expenses must be "necessary for either parent's employment, education, or vocational training" and "determined by the tribunal to be appropriate," and "appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(c)(1).

In its decision, the trial court found that it was "appropriate to use Mother's evidence of work related child care expenses" as reflected in her tax returns for purposes of calculating retroactive child support. Father argues that these expenses are not appropriate or appropriate to the parents' lifestyle or financial abilities. For example, in 2010, Mother's award of child support was based upon work-related child care expenses of $1,404 per month, the cost of a nanny. Mother's income was $36,800 for that year. In

---

[5] The court made a few comments with respect to underemployment at the hearing, most notably, the following:

> Now obviously if you want to try to claim that since the birth of this child she has voluntarily underemployed herself, you can talk about that. But there is a lot of things that people do prebirth or pre-family to make a whole lot more money and then once they have a family they say, well, wait a minute, I can't continue to make $250,000 a year and be any kind of parent to my child.

But we must consider the court's orders. A court speaks through its orders rather than through the hearing transcript. *Alexander v. JB Partners*, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011).

8

2013, Mother claimed the full credit for daycare despite the fact that she was working as a contractor on her new home.

With respect to the trial court's treatment of work-related child care expenses, Father also objects to the trial court's apparent use of judicial notice of the reasonableness of the cost of Mother's nanny. A judicially noticed fact must be "one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b).

The trial judge made several statements indicating that she was applying her own personal experience to the child care expense issue. For example: "Do you have any proof that daycare would be any cheaper [than a nanny]? Because I've always had a nanny and it was cheaper than daycare." The trial judge also made the following statements:

-Much more expensive. I mean, I'm just saying. It's not evidence but I always found a nanny to be cheaper.

-Well, first off, if you ask anybody, daycare for a three month old is significantly higher than daycare for a two year old. I mean, unless you've got somebody that can come in here and tell me that this woman could have put this child in a daycare that would have been far cheaper, that would have been flexible with her coming in and nurse at any given time, given the prematurity of this child, that she could have come and picked up and taken any time she wanted. I mean, there is a while [sic] lot of benefits for a self-employed mother to have that versus daycare. If you put a child in daycare, you're stuck with the full amount of daycare expense whether they come or not. If you use a nanny, sometimes you can pay hourly and not have to pay for a full week if she was only using her three days a week she said.

The relative affordability of a nanny versus daycare is not a matter "generally known within the territorial jurisdiction of the trial court or . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). Therefore, judicial notice was not appropriate. The trial judge's interjection of her personal views was improper.

Father has identified evidence in the record to support his argument that Mother's child care expenses are disproportionate to her earnings. The trial court's written decision contains only a general conclusion and does not specifically address these expenses. Comments made by the trial judge at the hearing indicate that the judge improperly allowed her personal views to influence the court's decision regarding the reasonableness of the child care expenses. Mother's brief contains no argument

9

regarding work-related child care expenses. We have concluded that the trial court abused its discretion in its consideration of work-related child care expenses. Consequently, we must reverse the court's decision on this issue and remand for a new hearing on work-related child care expenses.

C. Father's income. Father also assigns error to the trial court's decision to attribute additional income to him. He concedes, however, that the trial court properly attributed additional income to him for the free use of his mother's condominium (although he argues that the amount attributed should have been $600 rather than $650 per month). The Child Support Guidelines provide that a trial court may impute additional income to a parent in calculating child support if the parent fails to produce reliable evidence of income. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(II). Imputing income means "assign[ing] or attribut[ing] an income level to the parent that may not reflect the parent's actual gross income." *Massey*, 315 S.W.3d at 795.

The trial court found that Father "lacks credibility as to his income and that he failed to provide reliable evidence of his 'total' income." As a result, the court found it appropriate to impute additional income to Father in accordance with the Guidelines. The trial court discussed the proof as to Father's income at length:

Father's testimony and documentation of income are inconsistent and often without verification by appropriate documentation. Father's proof of actual income has been at issue since the inception of this litigation; yet he failed to keep appropriate documentation of his self-employed income and his rental income. Father's 2009 tax return (Exhibit 32), upon which the Magistrate relied when he set temporary child support on June 18, 2010 (Exhibit 4), reflects that Father's adjusted gross income was $41,538.27. Early in the case, on July 12, 2010, during Father's deposition he was asked, "[w]ith your job experience and education, do you feel like you're maximizing or at least living up to your potential in your current employment?" and responded, "No, sir; I don't." . . . On his 2010 federal income tax return (Exhibit 14, collective), Father's gross income is reported as $36,255.54. With his 2010 federal income tax return, Father included a Schedule C-EZ reflecting $4,200 in gross receipts from working for his uncle. Father testified that he did not receive 1099s from his uncle in 2010 and admitted that he sometimes cashed the checks from his uncle rather than depositing them into his bank account. However, in spite of this testimony about not including 1099's from his uncle for tax year 2010, he did include 1099's from his uncle for the tax year 2011. . . . A review of Trial Exhibit 14 reveals his uncle owns several different business entities and keeps records of pay to 1099 contractors. The Court finds it difficult to believe he did not issue [Father] 1099's in 2010 when he did so in 2011. Father indicated on his September 16, 2010 credit application to purchase a

Volkswagon Jetta (Exhibit 26) that he earned $2,400 in "monthly employment income" and received $1,200 as "additional monthly income" ($28,800 + $14,400 = $43,200). Two (2) months earlier, in his deposition on July 12, 2010, Father testified that he made $2,300 per month and had only received approximately $1,500 for the first seven (7) months of the year painting for his uncle ($27,600 + 1,500 = $29,100). In Father's first Motion to Modify Child Support Obligation filed on November 4, 2010, Father represented to the Court that his gross income (as of October 29, 2010) was $25,355.23.

On Father's 2011 federal income tax return signed by him on April 15, 2012 (Exhibit 14, collective), Father's gross income is reported as $27,475.00. On the credit application to finance $145,000 for the purchase of the Fatherland Street rental property executed by Father just two (2) months earlier on February 10, 2012, he indicated that his income was $40,000 annually (Exhibit 25). Notably, when Father applied for the mortgage to purchase the rental property at 600 Fatherland Street for $149,000, he indicated that he planned to use the property as his personal residence. At trial, Father admitted that he never intended to use the property as his personal residence and that he was living rent free in a condominium owned by his mother. [Discussion of evidence regarding Father's misrepresentations regarding paying rent.] At the trial of this case, Father admitted that these statements [that he paid rent to his mother], made under oath, were false.

Additionally, Father admitted that he made false representations on his mortgage application to fund the purchase of the Fatherland Street rental property when he indicated that he owed no child support obligations or debt to the U.S. government . . . . To fund the downpayment for the purchase of the Fatherland Street rental property, Father received a "gift" from Rich Rajotte (the "Donor") in the amount of $9,500.00 (Exhibit 41). . . . By e-mail dated February 4, 2012 from Father to the Donor (Exhibit 48 and 49), Father asks, "does the gift loan have to be deposited in my bank account or can we write a bank check or something like that? I've got some hesitation on that because of my child support, but we can discuss that too."

Father's 2012 tax return reflects gross income in the amount of $41,393 (Exhibit 59). This income tax return does not include the $9,500.00 gift from the Donor. . . . Father testified that he began working for his current employer, Schlusselbauer North America, in November, 2012. The only income additional to W-2 income reported by Father for the year 2012 on the return is $693.00 earned for services as a "musician." Rental income from the Fatherland Street property is not included on the

return. According to Father's testimony on August 14, 2013 (Exhibit 45), the monthly mortgage payment associated with the purchase of the Fatherland Street property is $718.72. . . . Testimony from Mr. Rajotte, who co-owns the rental property with Father, indicates that monthly rental income from the property is $1,500, which is typically in cash (Exhibit 55). After making the monthly mortgage payment of $718.72, the net rental income from the property is arguably $781.28 per month. The Court finds that Father's testimony that he receives none of this income is highly questionable when considering his lack of credibility related to reporting his income from self-employment as a painter for his uncle.

As the percentage of Father's ownership in the rental property was not established pursuant to Tenn. Code Ann. § 36-5-903,[6] the Court presumes that Father's ownership interest in the Fatherland Street property is fifty percent (50%).

. . .

The Court finds that Father did not rebut the presumption of 50/50 ownership in 600 Fatherland Street by he and Mr. Rajotte pursuant to T.C.A. § 36-5-903. Further, he does not deny that he is the only owner of the property obligated on the mortgage. The Court does not find credible his testimony that he owns zero percent of the property.

The 2012 tax return submitted by Father into evidence at trial is dated October 14, 2013. His "Affidavit of Income And Property" in support of his "Slow Pay" motion filed on May 17, 2013, reports income in the amount of $4,000 per month (before taxes) from Schlusselbauer North America plus $300 per month from playing bagpipes, which totals $51,600 yearly. This Affidavit fails to account for any rental income for the duplex---it is not even mentioned.

Father has not prepared or filed a tax return for the year 2013, although this information would have been helpful to the Court. His 2013 W-2 from Schlusselbauer (Exhibit 57) indicates that he earned $45,333.36 in gross wages; however, he testified that his employment agreement with the company dated April 29, 2013 (Exhibit 7) sets his annual salary at

---

[6] Tennessee Code Annotated section 36-5-903(a) states:

There shall be a rebuttable presumption concerning property that is subject this part, except where otherwise clearly noted by the evidence of title or otherwise, or where by law ownership of property is otherwise clearly stated, that at least one-half of all real or tangible personal property that is titled to or in the possession of the obligor is owned by the obligor who is subject to the lien provisions of this part.

$48,000.00 and includes bonuses over and above that amount. Father admitted earning some additional income from playing bagpipes in 2013, but did not have a 1099 to reflect the precise amount nor an accounting of how much it totaled in 2013. Father's co-ownership of the Fatherland Street rental property continued through the year 2013 and continues to this day.

In imputing additional income to Father, the trial court also took into account the value of bartered services. Father had an arrangement with his attorney to barter home improvement and maintenance services in exchange for legal fees associated with this case. Father failed to report the value of these services as income. The trial court determined that the amount of $20,327.50 should be added to Father's income in 2013.

Father makes several arguments regarding the trial court's analysis and decision to attribute additional income to him. Father asserts that "there was not one iota of evidence to suggest Father received any money from that [the Fatherland Street] property." Father and Eric Rajotte both testified that the rental income was used to pay the mortgage, expenses, and utilities and that they did not make any money from the rent. The trial court, however, found Father's testimony that he received none of the rent as income lacking in credibility.[7] A trial court's findings of fact based on its assessment of witness credibility should not be reversed absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). We cannot say that there is clear and convincing evidence to call into question the correctness of the trial court's credibility determination.

As to Father's objection to the amount of income attributed to him for free rent, we find no error. At trial, Father admitted, when presented with his July 2010 deposition, that he had submitted a lease agreement and claimed to be paying $650 a month beginning in June 2010. Thus, it was not unreasonable for the trial court to attribute $650 a month in income for rent.

Father also argues that the trial court "wrongly attributed income from barter with Father's attorney." Father relies on an IRS circular stating that barter income is reported when earned. He asserts that, in this case, the income was unearned because he had not completed the agreed work; moreover, the work he would perform for his attorney would not pay off his entire bill. At the hearing on attorney fees, counsel for Father testified that Father currently owed him $22,558.33 in attorney fees and had only paid $600.00. He further testified that, pursuant to an agreement between the attorney and Father, Father was performing work at a house that the attorney was selling and at his new house in exchange for legal services. The attorney testified that he doubted that Father's in-

---

[7] Finding that Father's testimony on this point lacks credibility also suggests a lack of credibility in Rajotte's testimony as well.

13

kind services would cover all of the legal fees he owed. They had not valued Father's services.

IRS Publication 525 contains a section on bartering which provides: "You must include in your income, at the time received, the fair market value of property or services you receive in bartering." The examples provided in this section make clear that each party to the bartering arrangement includes the fair market value of the goods or services when received, even though the other party may not receive its goods or services until a later time. The question, though, is how much of the legal services received by Father he had paid for with his home improvement and maintenance services. To answer this question requires placing a value on those services, something the trial court failed to do. We conclude that it was error for the trial court to attribute the entire amount of Father's attorney fees to his income when all of the proof indicated that he had not performed sufficient in-kind services to cover the entire bill.

We further find that the trial court erred in concluding that Father had failed to overcome the statutory presumption of 50/50 ownership established by Tenn. Code Ann. § 36-5-903 (set forth in footnote four). The record includes a deed to the Fatherland property showing that it is owned jointly by Father, Eric Rajotte, and Richard Rajotte. Thus, one-half ownership is "otherwise clearly noted by the evidence of title." Tenn. Code Ann. § 36-5-903(a).

Thus, with respect to Father's income, we have determined that the trial court erred in attributing the value of all of the legal services to Father (based on the bartered in-kind services) and in presuming that Father owned 50% of the Fatherland property. We, therefore, remand the issue of Father's income to the trial court for reconsideration.

### (3) Audio/video recording

Father argues that the trial court erred in enjoining and restraining him from making audio or video recordings when the parties exchanged the child for parenting time. He argues that he was denied notice as to the basis for the motion seeking this relief and was not given an opportunity to be heard. A court's decision to issue or not to issue injunctive relief is reviewed under the abuse of discretion standard. *Otter's Chicken Tender, LLC v. Coppage*, No. M2010-02312-COA-R3-CV, 2011 WL 2552663, at *3 (Tenn. Ct. App. June 27, 2011); *Gentry v. McCain*, 329 S.W.3d 786, 793 (Tenn. Ct. App. 2010).

Mother filed a motion, in June 2013, requesting a restraining order to restrain and enjoin Father from "continuing to video and/or record the exchange of the parties' minor child between the parties." The motion was set for July 9, 2013, the first day of the trial. Mother points out that her motion was filed a day after she was served with notice that Father intended to play, at trial, a recording of a conversation between Mother and Father during the exchange of the child on June 21, 2013. Before the tape of this exchange was

played at trial, Mother reminded the court that her motion to stop further recording was pending.

Father's main assertion is that Mother failed to comply with Tenn. R. Civ. P. 7.02(1), which states:

> An application to the court for an order shall be by motion which, *unless made during a hearing or trial*, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion.

(Emphasis added). Father argues that Mother's motion failed to "state with particularity the grounds therefor," that he was denied notice of the basis for the motion, and that he did not have an opportunity to be heard. Mother argues that she made her motion in writing *and* orally at trial and, therefore, she did not have to comply with all of the requirements following the phrase "unless made during a hearing or trial" in Tenn. R. Civ. P. 7.02.

We believe the reason for Mother's motion is implicit from the chain of filings, testimony, and nature of the proceedings—a concern about creating a hostile atmosphere during the exchange. Father introduced the recording from June 2013 and had a chance to argue for the usefulness of such evidence. He was on notice of the issues at play. We cannot say that the trial court abused its discretion in restraining Father from recording the exchanges.

### (4) Health insurance

The next issue is whether the trial court erred in ordering Mother to provide health insurance for the child rather than allowing Father to provide the health insurance. Father points out that, by the end of the trial, he had remarried and his wife had health insurance that would cover the child at no cost.

The Child Support Guidelines contemplate that the health insurance premium for the child "shall be divided between the *parents* pro rata." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(3). "Amounts paid by a step-parent shall not be considered in the calculation" of child support. Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(a)(6). In declining to order the stepmother's health insurance plan to cover child, the trial court stated, at the hearing: "It's not the stepmother's responsibility. It's one of these parents' responsibility to have medical."

We find no error in the trial court's decision to order Mother to provide health insurance for the child.

(5) <u>Mediation</u>

Father argues that the trial court erred in ordering the parties to attend mediation in the event of disagreement about the parenting plan. Father argues that Mother will either refuse to mediate or go through the motions but refuse to agree to anything, thereby requiring Father to incur the expense of mediation but still end up in court. Father asserts that the parenting plan should state "that any differences between the parties be resolved by the court."

Tennessee Code Annotated section 36-6-404(a)(4) requires that a permanent parenting plan must "[p]rovide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406 [not applicable here]." Thus, the court was required to include a provision for some type of dispute resolution and could not allow the parties to go directly to court without some extenuating circumstances, such as abuse, which are not at play here. The trial court did not err in ordering the parties to attend mediation to resolve disagreements regarding the parenting plan.

(6) <u>Decision-making authority</u>

Father objects to the trial court's decision to allocate sole decision-making authority to Mother with respect to educational, non-emergency medical, and extra-curricular activities. He asserts that, in the past, Mother has not consulted him regarding decisions and has not given him the opportunity to participate. Moreover, he alleges that Mother has refused to respond to his requests for additional information.

Mother emphasizes the parties' ineffective communication, a fact found by the trial court. The trial court read e-mail communications between the parties and stated: "The record is replete with e-mail communications between the parties demonstrating that Father frequently second-guesses medical decisions by Mother on behalf of the child in consultation with medical providers." Father acknowledged at trial that, where there was a disagreement between the parties, he would ultimately defer to Mother. Father conceded in his brief that, with respect to educational decisions, he "is also concerned that Mother is making decisions which will affect him financially."

Tennessee Code Annotated section 36-6-407(c) requires a court to consider the following criteria in allocating decision-making authority:

(1) The existence of a limitation under § 36-6-406 [not applicable here];
(2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;

16

(3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and

(4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Only subsection (4) would support joint decision making authority in this case. Subsection (1) is not applicable. Subsection (2) would support Mother since she has historically been the primary decision-maker. And subsection (3) would support Mother as the court made a specific finding that the parties "are not able to effectively communicate," and she has been the primary decision-maker and caregiver.

We find no error in the trial court's decision to make Mother the sole decision-maker.

(7) Attorney fees

Father argues that he should receive his attorney fees on appeal, and Mother asserts that she should have been awarded her attorney fees below and on appeal.

In Tennessee, courts follow the American Rule, which provides that litigants must pay their own attorney fees unless there is a statute or contractual provision providing otherwise. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000). We review a trial court's decision to award attorney fees under an abuse of discretion standard. *In re Estate of Greenamyre*, 219 S.W.3d 877, 885 (Tenn. Ct. App. 2005). A trial court abuses its discretion only when it applies an incorrect legal standard or when it reaches a decision against logic or reasoning that causes an injustice to the complaining party. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under this standard, we are required to uphold the ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Furthermore, "we are not permitted to substitute our judgment for that of the trial court." *Id.* Thus, under the abuse of discretion standard, we give "great deference" to the trial court's decision. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003).

We begin with Mother's assertion that she should have been awarded her attorney fees at the trial level. We must first find some authority that would allow the trial court to make such an award. Mother relies upon Tenn. Code Ann. §§ 36-2-311(a)(14) and 36-5-103(c); the latter has been applied to juvenile cases. *See In re Christopher A.D.*, No. M2010-01385-COA-R3-JV, 2012 WL 5873571, at *8 (Tenn. Ct. App. Nov. 20, 2012); *In re A.M.K.*, No. E2011-00292-COA-R3-JV, 2011 WL 3557083, at *5 (Tenn. Ct. App. Aug. 11, 2011). Though the trial court had the authority to award attorney fees, we

cannot say that it abused its discretion in declining to do so.  The court found that each party should bear the expense of his or her own attorney fees.

As to the matter of attorney fees on appeal, we decline to award fees to either party because each has been successful on some issues on appeal.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  In addition, the appellant's motion to include post-judgment facts is denied.  Costs on appeal shall be assessed equally between the two parties, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE